IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DEEPSTAR MARINE, INC., | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action No. 12-7628 (JBS/KMW) |
| XYLEM DEWATERING SOLUTIONS, INC., | **OPINION** |
| Defendant. | |

APPEARANCES:

Robert P. Snyder, Esq.
ROBERT P. SNYDER & ASSOCIATES
128 Ivy Lane
King of Prussia, PA 19406
      Attorney for Plaintiff

David Michael Fabian, Esq.
TRAFLET & FABIAN, ESQS.
Carriage Court Two
264 South Street
Morristown, NJ 07960
      Attorney for Defendant

**SIMANDLE, Chief Judge:**

**I.   INTRODUCTION**

This matter comes before the Court on Defendant Xylem

Dewatering Solutions, Inc.'s[1] motion for partial summary

judgment.  [Docket Item 18.]  The West End Boat Club ("WEBC"),

which is not a party to this action, hired Plaintiff Deepstar

Marine, Inc., to dredge its marina on the Delaware River, and

---

[1] Defendant does business as Godwin Pumps of America.

Plaintiff rented hydraulic pumps and other equipment from Defendant.  Plaintiff claims breach of contract and negligent misrepresentation.  Defendant asserts a counterclaim for unpaid invoices.

Defendant asks the Court to enter summary judgment for Defendant on Plaintiff's negligent misrepresentation claim and on Defendant's counterclaim for unpaid invoices.  The Court heard oral argument on July 24, 2014.  For the reasons set forth below, Defendant's motion for partial summary judgment will be granted in part and denied in part.

## II.  BACKGROUND

### A. Factual Background

#### 1. Parties

Plaintiff is a Pennsylvania corporation, which focuses its business on marine construction and dredging (Def. Ex. B [Docket Item 18-3], McKee Dep. 60:8-13, June 24, 2013.)  Charles McKee is Plaintiff's President.  (Def. Statement of Undisputed Facts ("SMF")[Docket Item 18-11] ¶ 1.)

Defendant is a New Jersey corporation that supplies pumping equipment for use in construction.  Defendant's website states, "Count on [Defendant] for thick sludge removal resulting from material dredging."  (McKee Aff. ¶ 3 [Docket Item 19-4].)  During the events relevant to this case, Jack Farrell was

2

Defendant's Branch Manager and Eugene Crowell was one of
Defendant's Inside Sales Representatives.  (SMF ¶¶ 23-24.)

### 2. West End Boat Club Project

WEBC needed dredging in its marina.  (Def. Ex. E [Docket
Item 18-3], WEBC Contract at 1.)  On February 22, 2010,
Plaintiff submitted a proposed Dredge Methodology and
Operational Plan ("Dredge Plan") to WEBC.  (SMF ¶ 8.)
Plaintiff's Dredge Plan had two steps: 1) mechanical dredging
and 2) transporting waste material in 3000-cubic-yard barges to
a Waste Management facility at Biles Island in Fairless Hills,
PA.  (Id. ¶ 9.)  At the Biles Island facility, "a pre positioned
spud barge with a Hydraulic pump will off load the larger hopper
Barges with a hydraulic pumping system."  (Def. Ex. C [Docket
Item 18-3], Dredge Plan at DEEPSTAR00143.)

On August 12, 2010, Plaintiff submitted a contract to WEBC.
(SMF ¶ 17).  Plaintiff agreed to provide all personnel and
equipment for the project, plus all "offloading pumps &
associated discharge hoses . . . ."  (Def. Ex. E, WEBC Contract
at 2.)  Plaintiff's President McKee and WEBC's authorized agent
executed the contract on October 11, 2010.  (Id. at 4.)
Plaintiff received its first payment and notice to proceed with
the WEBC project on October 21, 2010.  (Id. at 4.)

### 3. Communications Before Pump Delivery

Plaintiff did not provide the Dredge Plan to Defendant before submitting it to WEBC on February 22, 2010.  (SMF ¶ 13.)

Defendant first learned of the WEBC project in September 2011, almost a year after Plaintiff received its first check and notice to proceed, when McKee contacted Defendant about renting a pumping system.  (Id. ¶¶ 13, 23.)  In September 2011, McKee met with Defendant's representatives Farrell and Crowell.  (Id.) McKee explained that he "would be emptying barges containing 3000 cubic yards of dredge spoils."  (Def. Ex. M [Docket Item 18-5], Def. Resp. to Pl. Interrog. at Resp. No. 4 at 5.)

McKee indicated that "he wanted to empty barges out as soon as possible."  (Pl. Ex. A [Docket Item 19-2], Crowell Dep. 50:12-15, June 21, 2013.)  McKee also did not give Farrell or Crowell a copy of the WEBC Contract or tell them Plaintiff's pump rental budget.  (SMF ¶ 25.)

After the meeting, Crowell prepared an initial proposal dated September 14, 2011.  (Id. ¶ 29.)  Crowell suggested a "six-inch diesel pumpset to convey the product consisting of mud, clay and silt from a barge to the waste management facility" as well as a "four-inch diesel high pressure pumpset to act as an agitator to get the product into a suspended

state."[2]   (Def. Ex. I [Docket Item 18-4], Rental Quotation 101032955 at DEEPSTAR00029.)   The proposal "estimate[d] that it [would] take approximately 75-100 hours to convey 3,000 cubic yards of material to its final destination based on 10% solids content in the suspension." (Id.)

When asked about his initial decision to use a 6-inch pump, Crowell said he based it off "the calculations that [he] made using the numbers provided by Mr. McKee." (Def. Ex. H [Docket Item 18-4], Crowell Dep. 35:5-7, June 21, 2013.)   The record contains no further evidence about the numbers that McKee provided.

McKee was not satisfied that the six-inch pump would convey the material as quickly as required.  (Def. Ex. M, Def. Resp. to Pl. Interrog. at Resp. No. 10 at 14.)   So on September 16, 2011, Crowell submitted a revised proposal with an eight-inch pump to make the pumping system faster, (SMF ¶ 30).   Similarly to the original proposal, the September 16, 2011 proposal included the same specifications for an agitating system and estimated the same number of hours to convey the waste material. (Def. Ex. J [Docket Item 18-4], Rental Quotation 101033115 at DEEPSTAR00035.)

---

[2] Agitating the slurry "to obtain a mixture of 10% slurry and 90% water (i.e., 10% solids content in suspension)" allows the pump to move a greater volume of material at a faster rate than otherwise.  (Def. Ex. M, Def. Resp. to Pl. Interrog. at Resp. No. 4 at 5-6.)

Defendant's September 16, 2011 proposal noted "that adding a second identical pumpset to the proposed system will almost double the production rate." (Id.) However, McKee decided not to add a second pumpset because he "did not want to introduce anything . . . that could possibly interfere with the pump sets ability to pump 3000 cubic yards of material in 32 hours." (McKee Aff. ¶ 8 [Docket Item 19-3].)

McKee asserts that he spoke with Crowell on the telephone within three days of receiving the September 16, 2011 proposal and "told him that the [revised] proposal was unacceptable since [he] needed to unload the 3000 cubic yard barge in 32 hours" and that Crowell responded with "assurances and representations that [Defendant] would assemble a pump package to meet [his] above referenced unloading requirements." (McKee Aff. ¶ 5.) When McKee was asked "if there [was] a document from either [Plaintiff] or [Defendant] to the other, where Mr. Crowell state[d] that he [would] empty a barge in 32 pumping hours," McKee responded, "[w]ritten, no." (McKee Dep. 324:9-14, July 30, 2013.)

McKee claims that he "memorialized the above referenced conversation with [Crowell] in an e-mail to Crowell on 9/18/11, in which [McKee] reiterated the need to have equipment that could meet the specific time requirements for faster rates of pumping dredging spoils." (McKee Aff. ¶ 6.) In the email,

6

McKee wrote, "[l]ast we spoke on Thursday, we were upgrading to a 12'' pump to get faster rates.  Please also figure a larger pump to agitate the mixture.  I need to get these items loaded onto our barge to do the job asap.  Please call me Monday morning . . . ." [Docket Item 19-5.]

The record before the Court has no information about Crowell's response to McKee's email, if any, or about any conversations between Plaintiff and Defendant after this email and before Plaintiff delivered the first check to Defendant.

### 4. Equipment Delivery and McKee's Dissatisfaction

On September 19, 2011, McKee hand-delivered a check to Defendant for $15,737.88.  (SMF ¶ 32.)  On September 21, 2011, McKee handed a check for $1,100 to Defendant's truck driver when the pumping equipment was delivered.  (Id. ¶ 33.)  The equipment delivered on that day included an eight-inch pump, not a 12-inch pump.  (Farrell Aff. ¶ 2 [Docket Item 18-8] Ex. A at 1-2.) The record does not indicate that McKee complained that the equipment he received was not the equipment he expected.

After September 21, 2011, Plaintiff never paid another invoice because McKee was dissatisfied.  (Id. ¶ 39.)  McKee contended that "the pumping set provided by [Defendant] was never capable of accomplishing the job, in accordance with [McKee's] requirements and [Defendant's] representations,

including emptying a 3,000 cubic yard barge of dredging spoils in approximately 32 pumping hours." (McKee Aff. ¶ 9.)

### 5. Communication After Pump Delivery

On October 24, 2011, Rhonda Miller, a collections specialist working for Defendant, contacted McKee regarding Plaintiff's failure to pay its balance. (Def. Ex. M, Def. Resp. to Pl. Interrog. at Resp. No. 4 at 5.) McKee told Miller that "he was in discussions with [Crowell] about a discount on the weekly equipment rental charges." (Id.)

In mid-October 2011, McKee spoke with Crowell about possibly upgrading to a larger pump to increase productivity. (Def. Ex. O [Docket Item 18-5], McKee Dep. 56:18-57:1, August 1, 2013.) Plaintiff claims that Crowell reassured McKee by "unequivocally represent[ing] that 'an eight inch pump can pump as much as a 12 inch pump.'" (SMF ¶ 60.)

On or about November 7, 2011, Farrell, Crowell, and Defendant's engineer, Patrick Witts, met with McKee. (Id. ¶ 48.) McKee inquired about using a larger 12-inch pump, but Farrell and Witts "explained that unless the solids content was being properly agitated, a 12-inch pump would pull more water out of the barge than dredged material, which would effectively defeat the purpose of adding water to agitate and suspend

sediment to create a slurry and then remove that slurry." (Def. Ex. M, Def. Resp. to Pl. Interrog. at Resp. No. 4 at 6).[3]

As of December 2, 2011, Plaintiff claimed to WEBC that it had completed the dredging work. (SMF ¶ 64.)

On January 31, 2012, Defendant requested an update on the WEBC project, reminded Plaintiff that Defendant's equipment was still under rental, demanded payment on outstanding invoices, and advised that additional rental invoices would be generated until the equipment was returned. (Id. ¶ 72.)

### 6. Unpaid Invoices

Defendant generated sixty-two invoices pursuant to nine different Rental and/or Field Service Contracts with Plaintiff. (Id. ¶¶ 37-38.)

After paying the first two checks for $15,737.88 and $1,100.00, Plaintiff never paid Defendant again. (SMF ¶ 40.) The unpaid invoices total $187,086.02. (Farrell Aff. ¶ 7 [Docket Item 18-7].)

### 7. Other Litigation Regarding the Dredging Project

WEBC refused to pay the final amount due under its contract with Plaintiff and filed a lawsuit against Plaintiff on January

---

[3] Defendant asserts that it sent employees out to train Plaintiff in the proper use of its equipment on November 9, 2011. Plaintiff disputes that any training session took place. The Court has not addressed this dispute because it is not material to the Court's adjudication of this motion and, specifically, to determining whether Defendant made negligent misrepresentations that induced Plaintiff to enter into a contractual agreement.

4, 2012 in the Court of Common Pleas of Delaware County, Pennsylvania. (SMF ¶ 66.)  WEBC alleged that Plaintiff failed to complete the dredging required under the WEBC contract and had been unjustly enriched by WEBC's prior payments. (Id.) Plaintiff filed a counterclaim against WEBC contending that WEBC's failure to make the final payment caused Plaintiff additional rental costs of $2,619 per day. (Id. ¶ 67.)

A marine vessel vendor, Droney Marine Construction, Inc. ("Droney"), sued Plaintiff in the Superior Court of Delaware, Sussex County, seeking to recover money owed for equipment that Droney provided for the WEBC project. (Id. ¶ 68.)  Plaintiff filed a counterclaim against Droney asserting that Droney's failure to provide promised equipment, operators, and crew prevented Plaintiff from completing the WEBC project by the required deadline and thus caused Plaintiff to incur significant additional costs. (Id. ¶ 69.)  In the Droney case, McKee testified that Plaintiff incurred $150,000 in lost profits on the WEBC project because of Droney's failure to provide the proper equipment, operators, and crew. (Id. ¶ 70.)

### 8. Plaintiff's Claims in This Litigation

Plaintiff asserts that Defendant made multiple negligent misrepresentations on which Plaintiff substantially and detrimentally relied and that Defendant breached the parties'

contractual agreement by failing to provide pumping equipment that met Plaintiff's specifications.

Plaintiff claims that because of Defendant's contractual breach and the negligent misrepresentation, Plaintiff "suffered approximately $345,494.04 in expectation damages, $6,058,700.00 in consequential damages, and $6,000,000 in damage to its reputation." (Pl. Opp'n. [Docket Item 19] at 7.)

The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the parties are citizens of different states. Venue is proper pursuant to 28 U.S.C. § 1391(b) because the Defendant resides and does business in this District and a substantial part of the events or omissions giving rise to the Complaint occurred in this District.

**B. Parties' Arguments**

Defendant argues that summary judgment should be entered on Plaintiff's negligent misrepresentation claim because Crowell's statement regarding the equivalence of eight- and twelve-inch pumps occurred after the parties had entered into a contract. Defendant also seeks summary judgment on its counterclaim for unpaid invoices because McKee admits Plaintiff did not pay any invoices after September 21, 2011. Defendant does not seek summary judgment on the breach of contract claim.

11

In opposition [Docket Item 19], Plaintiff argues that it detrimentally relied on three negligent misrepresentations made by Defendant.  First, Plaintiff contends that Crowell assured McKee that Defendant would provide a pump set capable of emptying a 3000-cubic-yard barge in 32 pumping hours.  Secondly, Plaintiff claims that it detrimentally relied on Defendant's website's representation that Defendant could be counted upon for dredging work.  Thirdly, Plaintiff argues that in mid-October 2011, Crowell represented that an eight-inch pump can pump as much as a twelve-inch pump.  Plaintiff also contends that Defendant materially breached the contract by failing to provide a pump that could meet Plaintiff's requirements and, therefore, Plaintiff has no obligation to pay the invoices.

In its reply [Docket Item 21], Defendant argues that Plaintiff must pay for the leased equipment because it accepted delivery and kept the equipment; Crowell's mid-October statement about eight- and 12-inch pumps being equivalent could not have induced Plaintiff to lease equipment in September 2011; the website representation is not an actionable representation and is mere puffery; the website misrepresentation is inapplicable because it refers to "thick sludge removal," which is different from the 10% material and 90% water slurry mixture on which Defendant's proposals to Plaintiff were based (Def. Reply at 9); Defendant has proven its claim for unpaid invoices because

12

Plaintiff admits that it did not pay the invoices; and the parties' contracts are leases under which taking or retaining the equipment constitutes acceptance of the contract.

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Essentially, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party." Id. The Court will view evidence in favor of the nonmoving party and extend any reasonable favorable inferences to be drawn from that evidence to that party. Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

Furthermore, "if the court does not grant all the relief requested by the motion, it may enter an order stating any material fact--including an item of damages or other relief-- that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

13

IV.   **DISCUSSION**

   **A. New Jersey Law Governs**

   New Jersey law governs because "[i]nasmuch as the district court [is] exercising diversity jurisdiction, it [is] required to apply the substantive law of . . . the forum state." Glenn Distributors Corp. v. Carlisle Plastics, Inc., 297 F.3d 294, 300 n.3 (3d Cir. 2002).  Both parties cited New Jersey law and neither party argues that a different state's law applies. Therefore, "[t]he parties agree that New Jersey law governs, and [the Court] will decide the case on that basis principally relying on opinions of the Supreme Court of New Jersey by which [the Court] [is] bound with respect to questions of New Jersey law." Elliott & Frantz, Inc. v. Ingersoll-Rand Co., 457 F.3d 312, 318-19 (3d Cir. 2006).

   **B. Negligent Misrepresentation Claim**

      **1. Negligent Misrepresentation Law**

   A "negligent misrepresentation constitutes '[a]n incorrect statement, negligently made and justifiably relied on, [and] may be the basis for recovery of damages for economic loss . . . sustained as a consequence of that reliance.'" McClellan v. Feit, 376 N.J. Super. 305, 317 (App. Div. 2005) (quoting H. Rosenblum, Inc. v. Adler, 93 N.J. 324, 334 (1983)).  Therefore, the elements that must be established to prevail on a negligent misrepresentation claim are a negligently made incorrect

statement by one party upon which another party justifiably and detrimentally relied.  See Carroll v. Cellco Partnership, 313 N.J. Super. 488, 503 (App. Div. 1998) (with negligent misrepresentation claim, "plaintiffs must prove that varying communications to plaintiffs were negligently made and that each plaintiff relied upon them").[4]

---

[4] Some federal courts have questioned whether negligent misrepresentation is a valid claim under New Jersey law when the parties have a contract.  E.g., Commerce Bancorp, Inc. v. BK Int'l Ins. Brokers, Ltd., 490 F. Supp. 2d 556, 563-64 (D.N.J. 2007) (concluding that Plaintiff's "negligent misrepresentation claim must also be dismissed because it is not a viable claim under New Jersey law" given the fact that "[t]his dispute involves two parties to a contract, who negotiated at arms-length").  In Commerce Bank, all of the alleged negligent misrepresentations occurred after the parties had signed and executed a letter of intent agreement.  Commerce Bank, like other DNJ cases on this issue, is therefore distinguishable because it involves post-contractual statements.  In other words, "[t]he pattern that has emerged in New Jersey decisional law is that claims for fraud in the performance of a contract, as opposed to fraud in the inducement of a contract, are not cognizable under New Jersey law."  Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co., 226 F. Supp. 2d 557, 564 (D.N.J. 2002).  Furthermore, New Jersey state courts have not questioned the validity of negligent misrepresentation claims when the parties are in a contractual relationship, particularly when the dispute relates to pre-contractual statements that induced someone to enter into contract.  E.g., DeAngelo v. Exxon Corp., Civ. A-791-98T3, 1999 WL 34014043 at *4 (N.J. Super. Ct. App. Div. Oct. 15, 1999) (between parties in a contractual relationship disputing validity of a pre-contractual representation that property was hazard-free, "there is no question that negligent misrepresentation is a cognizable cause of action").  Because the parties do not dispute that negligent misrepresentation is a valid claim and because Plaintiff's negligent misrepresentation claim asserts that Defendant's representations induced Plaintiff to enter into the contract, the Court need not address this issue further.

## 2. Three Misrepresentations

Plaintiff identifies three negligent misrepresentations on which Plaintiff substantially relied to its detriment.  First, Plaintiff claims that Crowell "represented to Mr. McKee . . . that XDS would assemble a pump set capable of emptying a 3000 cubic yard barge in 32 pumping hours . . . ."  (Pl. Opp'n. at 2 (emphasis in original).)

Plaintiff asserts that the second misrepresentation is the statement on Defendant's website: "Count on [Defendant] for thick sludge removal resulting from material dredging."  (McKee Aff. ¶ 3.)

And third, Plaintiff argues that, in mid-October 2011, "Crowell unequivocally represented that an eight inch pump can pump as much as a 12 inch pump" and that representation "was made to induce Deepstar to lease the pumping system."  (Pl. Opp'n. at 6-7 (emphasis in original).)

### a. All Three Statements Will Be Considered

As a preliminary matter, the Court notes that it will address each of these misrepresentations.  Defendant asserts that Plaintiff cannot claim any misrepresentation other than Crowell's statement that 8- and 12-inch pumps are equivalent because that statement is the only one specifically mentioned in Plaintiff's Complaint under Count II Negligent

16

Misrepresentation.  Defendant also emphasizes that the deadline for Plaintiff to amend its Complaint has passed.

This argument lacks merit.  Count II of the Complaint specifically incorporates all previous paragraphs by reference. (Compl. ¶ 39.)  Those previous paragraphs allege, <u>inter alia</u>, that "Crowell advised that he would put together the right pump package to do the job, in the required time frame," (<u>id.</u> ¶ 12); that "Crowell communicated to Deepstar that he had assembled a pump set . . . that met Deepstar's requirement that the pump set would empty the barge in 32 pumping hours," (<u>id.</u> ¶ 13); and that Plaintiff "recall[ed] both verbal representations, as well as representations appearing on the internet website for Godwin Pumps, that Godwin customers could 'count on Godwin Pumps for thick sludge removal resulting from material dredging,'" (<u>id.</u> ¶ 20 (citation omitted)).  In other words, the Complaint describes all three alleged misrepresentations.  Because Plaintiff incorporated all previous paragraphs by reference and because the previous paragraphs specified the other misrepresentations, Plaintiff is not limited to only the misrepresentation that was specifically mentioned under Count II.

Defendant cites <u>Nissen v. Rozsa</u>, Civ. 08-5563, 2011 WL 5240833 (D.N.J. Oct. 31, 2011), for the proposition that Plaintiff can only seek recovery for the one misrepresentation that was specifically pled in Count II of Plaintiff's Complaint.

Nissen is inapplicable.  The Nissen plaintiffs alleged that
Nissen defendants failed to pay the proper commission following
the sale of a pharmaceutical company.  Id. at *1.  In that case,
the first complaint alleged an agreement involving a 30/30/30/10
distribution of profits; the amended complaint mentioned an
agreement with a 50/50 distribution, but "[n]o count in the
Amended Complaint [sought] recovery under the 50/50 contract"
(id. at *3); and the Nissen plaintiffs later argued that they
were entitled to damages under either a 50/50 or 30/30/30/10
distribution.  The Nissen court held that the Nissen plaintiffs
were not entitled to a 50/50 distribution because they did not
seek recovery under the 50/50 agreement in the complaint or the
amended complaint and because a 50/50 distribution directly
contradicted the distributions that were previously sought.  The
Nissen court emphasized that the claims based on a 50/50
distribution were not "readily apparent" from the pleadings.
Id. at *6.  In the present case, Plaintiff's allegations about
the three different negligent misrepresentations are not
contradictory and all three statements were identified clearly
in the Complaint.  As such, the Court will allow Plaintiff to
base its negligent misrepresentation claim on all three alleged
misrepresentations.  The Court will now analyze each statement
in turn.

### b. Crowell's September 2011 Statements

Defendant asserts that "there is no competent evidence to support the allegation that Mr. Crowell represented that he would assemble a single pump set that would convey 3000 cubic yards of material in 32 pumping hours." (Def. Reply at 8.)  The Court disagrees.

A reasonable factfinder could conclude that Crowell negligently represented that he would provide a pumpset that met Plaintiff's specifications and that Plaintiff justifiably relied on those statements because of Defendant's expertise.  Crowell admitted at his deposition that his proposals were based upon numbers that McKee provided and that he knew McKee wanted to empty the barges as quickly as possible.  McKee's email reiterates the need for faster pumping equipment and states that upgrading to a 12-inch pump may be necessary.  McKee rejected the initial 6-inch pump proposal because it was not fast enough. And McKee's affidavit asserts that he told Crowell the exact time and volume requirements of the job and that Crowell provided assurances and representations that Defendant would assemble a pumpset capable of meeting those requirements.

The evidence thus includes Crowell's admission that he based his proposal on McKee's numbers and McKee's statements that he provided his specifications to Crowell and that he emphasized the importance of speed.  Viewing these facts in

19

Plaintiff's favor and extending any reasonable favorable
inferences to Plaintiff, the Court finds that a reasonable
factfinder could conclude that Crowell told Plaintiff he would
provide a pumpset that would meet Plaintiff's specifications.
Furthermore, a reasonable factfinder could conclude that
Plaintiff justifiably relied on such a representation because of
Defendant's expertise in supplying pumping equipment.

The record about what occurred during McKee's and Crowell's
conversations is limited, but "at the summary judgment stage the
judge's function is not himself to weigh the evidence and
determine the truth of the matter but to determine whether there
is a genuine issue for trial." Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 249 (1986).  There is a genuine issue for trial
because a reasonable factfinder could conclude that Crowell
negligently misrepresented that he would provide the correct
pumpset based on Plaintiff's specifications.  The Court will
deny Defendant's summary judgment motion on Plaintiff's
negligent misrepresentation claim based on Crowell's September
2011 statements.

### c. The Website Advertisement

Defendant argues that the website representation is mere
puffery and thus not actionable; is inapplicable because it
describes thick sludge removal resulting from material dredging
whereas Defendant's proposals referenced a 10% material and 90%

20

water slurry mixture; and is irrelevant because it was made after the parties entered a contract.  Defendant's motion will be granted as to this specific statement.

"Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language." Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 945 (3d Cir. 1993).  "[S]tatements that can be categorized as 'puffery' or 'vague and ill-defined opinions' are not assurances of fact and thus do not constitute misrepresentations." CPS MedManagement LLC v. Bergen Reg'l Med. Ctr., L.P., 940 F. Supp. 2d 141, 159 (D.N.J. 2013) (citation omitted).  It "is distinguishable from misdescriptions or false representations of specific characteristics of a product" and "[a]s such, it is not actionable." Castrol, 987 F.2d at 945. Under New Jersey law, statements of puffery are "simply put, not statements of fact . . . ." New Jersey Citizen Action v. Schering-Plough Corp., 367 N.J. Super. 8, 14 (App. Div. 2003).

The website representation is puffery under New Jersey law because it is vague and imprecise and does not present any specific factual representations about Defendant's product.  In Rodio v. Smith, 123 N.J. 345, 352 (1991), the New Jersey Supreme Court held that, "[h]owever persuasive, 'You're in good hands with Allstate' is nothing more than puffery."  In both the present case and Rodio, each statement is not an assurance of

fact, but rather a broad overstatement generally praising a company.

Other courts have held that the specific expression "count on" is puffery when there is no factual representation.  E.g., Brown v. Abbott Labs., Inc., Civ. 10-6674, 2011 WL 4496154, at *4 n.3 (N.D. Ill. Sept. 27, 2011) (applying New Jersey law and holding that statements to "count on Similac for nutrition you can trust" and "Moms can count on [Similac] for trusted nutrition" were puffery); Seibel v. A.O. Smith Corp., Civ. 97-0874, 1998 WL 656570, at *5  (W.D. Wis. July 9, 1998) (advertisement entitled "Your Harvestore Dealer, Count on Him'" was "sales puffery," because it was an "exaggeration[] made by a seller on which a buyer may not justifiably rely").

Defendant's website advertisement is puffery as a matter of law.  The Court will grant Defendant's summary judgment motion as to Plaintiff's negligent misrepresentation claim based on the website statement.[5]

### d. Crowell's October 2011 Statement

As to the third misrepresentation, no reasonable factfinder could conclude that Crowell's October 2011 statement induced

---

[5] Because the Court concludes that the website advertisement is puffery, the Court need not address whether "thick sludge" is different from the materials being dredged in this case and also need not address the issue of when Plaintiff first saw Defendant's website.

Plaintiff to enter into a contract with Defendant in September 2011.

By mid-October, the parties were already in a contractual relationship because money had been paid and equipment had been delivered.  The parties' Rental and Field Service Contracts are leases under New Jersey law.  A "lease" is defined as "a transfer of the right to possession and use of goods for a term in return for consideration."  N.J. Stat. Ann. § 12A:2A-103(1)(j).  New Jersey law defines the "acceptance of goods" to include situations where "the lessee signifies or acts with respect to the goods in a manner that signifies to the lessor or the supplier that the goods are conforming" or "the lessee fails to make an effective rejection of the goods."  N.J. Stat. Ann. § 12A:2A-515(1). Plaintiff made two initial payments and accepted delivery of Defendant's equipment.  In addition, there is no evidence in the record that Plaintiff attempted to return the equipment or complained that he did not receive the correct equipment.  There was consideration paid and acceptance of goods and, therefore, the Court finds that the parties entered into a contract in September of 2011.[6]

---

[6] The Court's finding is simply that the parties entered into a contract in September of 2011; the Court is not making any determinations regarding the breach of contract claim in the present Opinion.

Statements made after entering into a contract cannot be used for a negligent misrepresentation claim.  Negligent misrepresentation claims only involve fraudulent statements made to induce a party into a contract.  See Kende Leasing Corp. v. A.I. Credit Corp., 217 N.J. Super. 101, 118 (App. Div. 1987) ("in an action for negligent misrepresentation, there must be proof of action or inaction induced by the alleged misrepresentation"); Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co., 226 F. Supp. 2d 557, 563 (D.N.J. 2002) ("New Jersey federal and state decisions that have permitted a fraud claim to proceed with a breach of contract claim generally appear to have involved a fraud in the inducement of a contract or an analogous situation based on pre-contractual misrepresentations").

The Court concludes that, as a matter of law, the October 2011 statement was not a negligent misrepresentation because it did not induce plaintiff to enter into a contract, as one already existed between the parties.[7]  The Court will grant

---

[7] Moreover, Plaintiff states that "[a]lthough the misrepresentation regarding an 8 inch pump being able to pump as much as a 12 inch pump was not made before mid-October, Plaintiff relied upon multiple, critical, material misrepresentations made by Defendant as inducements to enter into a contractual relationship." (Pl. Opp'n at 9.)  In other words, Plaintiff acknowledges that the October 2011 statement came after Plaintiff began renting equipment and thus did not induce Plaintiff to enter into the contract. In addition, at oral argument, Plaintiff's counsel agreed that a party cannot obtain relief for a negligent misrepresentation made after the parties entered into a contract.

Defendant's summary judgment motion as to Plaintiff's negligent misrepresentation claim based on Crowell's October 2011 statement.

### C. Unpaid Invoices

The total amount of unpaid invoices is $187,086.02. (Farrell Aff. ¶ 7 [Docket Item 18-7].)  That total includes one unpaid invoice for damaged equipment.  Plaintiff disputes whether the equipment was damaged beyond normal wear and tear. Defendant excluded this single invoice, which totals $10,164.82, from its motion because "[a]lthough XDS is entitled to recover this amount . . ., XDS will seek recovery for that individual invoice at trial rather than as part of this motion." (Def. Reply at 3.)  With the present motion, Defendant therefore seeks $176,921.20 in unpaid invoices.  (Id. at 14.)

Under New Jersey law, Plaintiff must "pay rent for any goods accepted in accordance with the lease contract . . . ." N.J. Stat. Ann. § 12A:2A-516(1).  Plaintiff does not dispute that it failed to pay the invoices.  Instead, Plaintiff argues that "[w]hen there is a breach of a material term of an agreement, the non-breaching party is relieved of its obligations under the agreement." Nolan v. Lee Ho, 120 N.J. 465, 472 (1990).  Plaintiff also argues that its retention of the pumping equipment does not necessitate paying the invoices because New Jersey courts discourage "an absolute rule against

continued use" because "in certain situations continued use of goods by the buyer may be the most appropriate means of achieving mitigation . . . ." Cuesta v. Classic Wheels, Inc., 358 N.J. Super. 512, 520 (App. Div. 2003) (quoting Fablok Mills, Inc. v. Cocker Mach. & Foundry Co., 125 N.J. Super. 251, 257 (App. Div. 1973)). Plaintiff emphasizes that the "reasonableness of plaintiff's continued use of the machines, after revocation, is a question of fact to be resolved by a [factfinder] . . . ." Id. (quoting Fablok Mills, 125 N.J. Super. at 258-59).

Because the parties do not dispute that the invoices were never paid, the Court will treat the $176,921.20 in unpaid invoices as established for purposes of a potential trial, but will not enter judgment on Defendant's counterclaim. Defendant's motion is not addressing Plaintiff's breach of contract claim. At trial, the factfinder will examine the breach of contract claim and the reasonableness of Plaintiff's retention and use of the rented equipment. If Plaintiff prevails on the breach of contract claim at trial, then Plaintiff might not be required to pay the full amount, if any, of the unpaid invoices. Therefore, the Court will find, as a fact under Rule 56(g), that the invoices are unpaid, but will not enter judgment until the breach of contract claim is adjudicated. Cf. CPS MedManagement LLC v. Bergen Reg'l Med.

Ctr., L.P., 940 F. Supp. 2d 141, 152-53 (D.N.J. 2013) ("Because it neither disputed nor paid those invoices, the Hospital breached the Agreement.  I will therefore grant partial summary judgment . . . . I will stay entry and execution of that partial judgment, however, [because] [i]f the fact finder were to determine that MMM breached the Agreement, the Hospital's liability for the five invoices might be offset or eliminated.").

Defendant's motion for summary judgment on its counterclaim for unpaid invoices in the amount of $176,921.20 is granted in part and denied in part.  It is granted in part because the Court finds, pursuant to Fed. R. Civ. P. 56(g) that $176,921.20 was unpaid.  However, Defendant's motion is denied in part because the Court will not enter judgment for that amount in Defendant's favor.  If a reasonable factfinder finds that Defendant breached a material term of the contract, then Plaintiff may be absolved from paying the unpaid invoices. Therefore, the Court will find that Plaintiff has incurred $176,921.20 in unpaid invoices under Rule 56(g), but will not enter judgment in Defendant's favor at this time.

**V.   CONCLUSION**

The Court will grant Defendant's motion for summary judgment in part and deny in part.

27

The Court will deny Defendant's motion as to Plaintiff's negligent misrepresentation claim regarding Crowell's September 2011 statements because a reasonable factfinder could conclude that Crowell made negligent misrepresentations upon which Plaintiff justifiably relied.  The Court will grant Defendant's summary judgment as to Plaintiff's negligent misrepresentation claim based on the website statement because the website statement is puffery.  The Court will grant Defendant's motion as to Plaintiff's negligent misrepresentation claim based on Crowell's October 2011 statement because that statement did not induce Plaintiff to enter into a contract.  Defendant's motion for summary judgment on its counterclaim for unpaid invoices will be granted in part under Fed. R. Civ. P. 56(g); it is established that Plaintiff has incurred $176,921.20 in unpaid invoices.

An accompanying Order will be entered.


**July 30, 2014**                    **s/ Jerome B. Simandle**
Date                                 JEROME B. SIMANDLE
                                     Chief U.S. District Judge